**UNITED STATES of America**

v.

**John TROWERY.**

**Crim. No. 77–240.**

United States District Court,
W. D. Pennsylvania.

Feb. 14, 1978.

David B. Atkins, Jr., Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

Stanley W. Greenfield, Pittsburgh, Pa., for defendant.

## OPINION

MARSH, District Judge.

Defendant John Trowery was convicted in a jury trial on charges of possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) (Counts 3 and 4) and of conspiracy in violation of 21 U.S.C. § 846 (Count 1). The defendant now moves for a new trial or, in the alternative, for judgment of acquittal.*

John Trowery was one of six persons named in the indictment filed September 23, 1977. Co-defendant Nathaniel Goodson pleaded guilty to the conspiracy charge pursuant to a plea agreement in which the government agreed to move for dismissal of the substantive charges against him. Co-defendants John Duncan and Louis Pearson likewise pleaded guilty to the conspiracy. The two remaining defendants, Doree Holyfield and Fred Trowery, Jr., went to trial with John Trowery. Holyfield, who was charged with conspiracy and with possession of cocaine with intent to distribute (Count 2) was convicted on both charges. Fred Trowery, Jr., who also was charged with conspiracy and with possession of cocaine with intent to distribute (Count 4) was acquitted by the jury.

At the trial, co-defendant Nathaniel Goodson testified for the prosecution. According to Goodson, his long-time friend John Duncan introduced him to John Trowery in November, 1976 for the purpose of purchasing cocaine. Goodson received the first cocaine from John Trowery in November, 1976 at a cost of $100. Thereafter, he regularly obtained cocaine from John Trowery twice a week, some of which he sold and

---

* Defendant Trowery has not ordered a trial transcript and no transcript has been filed.

some of which he used himself. Goodson testified that during the same period after November, 1976, he also obtained cocaine from Louis Pearson two or three times a week. Goodson sold some of the cocaine he obtained from Trowery and Pearson to Doree Holyfield two or three times a week. When Goodson sold the cocaine he would give some of the money he received to John Trowery or Louis Pearson. Goodson said he was a former heroin addict and used the money he kept from the sales principally to support his habit.[1]

Goodson also testified that on April 26, 1977, while he was in Trowery's kitchen, John Trowery gave him six packets of cocaine, the subject of Count 3. Goodson said the cocaine was taken from a glass jar and the packets were enclosed in a plastic bag.

On the same day a search warrant was executed by police at the Trowery house. During the search a jar containing cocaine was found in the backyard by one of the officers. This was the subject of Count 4.

Taking the view of the evidence most favorable to the prosecution, as required, we think the guilty verdicts against John Trowery were supported by evidence beyond a reasonable doubt. Likewise, there was sufficient evidence for the jury to believe that there was an unlawful agreement among John Trowery, Nathaniel Goodson and Doree Holyfield to possess cocaine with intent to distribute it. The alternative motion of John Trowery for judgment of acquittal should be denied. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

We are not convinced that the errors alleged require that a new trial be granted to John Trowery, and therefore his motion for new trial also should be denied. Specifically, John Trowery complains that the court erred: (1) in denying his pretrial motion to suppress evidence; (2) in admitting government exhibits which were derived from evidence seized by city police, and in denying, during trial, defendant's motion to reconsider his motion to suppress evidence seized from Nathaniel Goodson on April 26, 1977, since there was no outstanding arrest warrant for Goodson on that date; (3) in failing to grant defendant's motion for relief from prejudicial joinder with respect to Count 2 of the indictment; (4) in permitting cross-examination of Robert Rose in which Rose was asked if he had been involved in selling cocaine; (5) that there was insufficient evidence to support Count 4 of the indictment, particularly in light of co-defendant Fred Trowery's admission that the evidence which was the subject of Count 4 belonged to Fred Trowery; and (6) that there was insufficient proof that the residence in which John Trowery was arrested was, in fact, his own so as to justify the court's charge that the defendant Trowery could be in constructive possession of items found in the home or its curtilage. Each of these assertions of error will be addressed below.

### (1)

A pretrial hearing was held on the defendant's motion to suppress evidence, and the motion was denied. The government exhibits derived from evidence seized by city detectives were properly admitted. See opinion dated January 3, 1978.

### (2)

From the evidence presented at trial, it appeared that there was not an outstanding arrest warrant for Goodson on April 26, 1977, and defendant Trowery again moved to suppress the evidence seized from Goodson that day by Detective Bowie. In an oral order, the court denied the motion and stated the reasons for its ruling.

On April 18, 1977, Detective Bowie and Detective James Dickerson, in possession of a search warrant for Doree Holyfield's house on Churchland Street, observed Goodson, a suspect, emerge from the house. When Goodson saw the detectives, he fled

---

1. After his arrests in the spring of 1977 Goodson joined the Black Action Program and has been taking methadone under supervision.

in his Cadillac car. The detectives pursued Goodson and saw him throw a package out of the car window. The package was retrieved by Detective Dickerson. Goodson escaped. The package contained cocaine. An arrest warrant was issued for Goodson. A few days later, Goodson was arrested and then released on bond.

On April 26, 1977, police had assembled on Lincoln Avenue to execute a search warrant at the residence of John Trowery. The police saw Goodson's car in front of the residence and saw Goodson coming down the steps of the home, looking all around. Officers in an unmarked car pulled out of a nearby alley. Goodson saw them and began to run. Detective Bowie identified himself as a police officer and chased Goodson a short distance. A scuffle ensued as Goodson tried to place a plastic bag with silver foil packets in his mouth. Bowie, believing the bag contained narcotics, retrieved it. Then he arrested Goodson.

The information in the search warrant alleged that John Trowery was distributing cocaine. The affidavit stated that the informant had observed John Trowery give Goodson some cocaine in exchange for a large sum of money. These circumstances, combined with Goodson's flight, gave rise to a suspicion of criminal conduct and justified Bowie's attempt to stop Goodson. Also, Bowie was justified in believing that the bag of foil packets Goodson tried to place in his mouth contained narcotics because of the circumstances and because narcotics are commonly packaged in that way.

Evidence from the crime laboratory disclosed that the plastic bag did contain six tin foil packs of cocaine and that a fingerprint of John Trowery was found on one of the foils. At the time Detective Bowie seized the plastic bag from the mouth of Goodson, John Trowery did not have a possessory interest in the cocaine. He had taken the cocaine from a jar in his kitchen and given it to Goodson in repayment of a debt. John Trowery did not have standing to challenge the seizure of the cocaine from Goodson by Detective Bowie on the street. *United States v. Turner*, 528 F.2d 143, 164 (9th Cir. 1975).

We think Trowery's trial motion to suppress this evidence was properly denied.

### (3)

The initial joinder of John Trowery and the other defendants was permissible under Rule 8(b), Fed.R.Crim.P. Even if the evidence had not been sufficient to sustain the charge of conspiracy contained in Count 1, there would have been no error in failing to grant the defendant's motion for relief from prejudicial joinder with respect to Count 2 of the indictment. *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *Peterson v. United States*, 405 F.2d 102 (8th Cir. 1968). Furthermore, as in *Stern v. United States*, 409 F.2d 819 (2nd Cir. 1969), the possibility of confusion or prejudice as a result of the joinder was removed by instructions to the jury to render separate verdicts, and by giving the jury separate verdict sheets against each defendant for each count in which he or she was charged. The jury acquitted Fred Trowery, Jr., on Counts 1 and 4, while finding John Trowery guilty of both counts. These verdicts indicate that the jury was able to separate the evidence against the various defendants.

### (4)

Robert Rose was called as a witness for John Trowery. Rose's testimony was designed to impeach Nathaniel Goodson. On cross-examination, the prosecution attempted to impeach Rose by bringing out that he had been convicted of armed robbery and of violating the "dangerous drug act." Rose's possible bias against Goodson was shown by Rose's admission that he had told Detective James Ramsey that one of the reasons he was testifying was that he believed Goodson had set him up in a case involving drugs. Rose volunteered that Goodson had told others that Rose was an informant and that this had led to Rose being injured.

Rose said that on April 26, Goodson asked him to inform anyone who might be looking for cocaine that Goodson had some availa-

ble. Rose testified that he had not used cocaine for two years. He then stated that he had not sold any either. In an attempt to show that this statement was untruthful, the prosecutor asked if it was not a fact that on March 30, 1977, at 5:15 p. m. Rose and his girlfriend Debby had sold some cocaine to Agent Charles Harvey. Rose answered, in effect denying it.

Counsel for John Trowery moved for a mistrial, and the motion was not granted. The court advised Rose that he did not have to answer any questions which tended to incriminate him.

■■ Even if the jury had fully believed Rose's testimony, there was still substantial uncontradicted evidence upon which they could have convicted John Trowery. Rose stated that he had met Goodson at 8:00 a. m., that Goodson had cocaine in his possession, and that Goodson said he was going to Trowery's to get some money. This testimony does not contradict the substantial evidence showing that Goodson was apprehended upon leaving the Trowery residence at 10:30 p. m. carrying cocaine wrapped in foil bearing John Trowery's fingerprint. Goodson admitted that although he went to Trowery's with the intention of being repaid for a debt in cash, Trowery had given him cocaine instead. The prosecutor's question to Rose did not in any way implicate John Trowery. The court has broad discretion in deciding whether to allow questions which shed light on the truthfulness of a witness. *Cf. United States v. Cahalane*, 560 F.2d 601, 607 (3rd Cir. 1977); *United States v. Batts*, 558 F.2d 513 (9th Cir. 1977); *United States v. Estell*, 539 F.2d 697 (10th Cir. 1976). Even if there was error in asking the question, it did not result in a level of prejudice against Trowery which would require a new trial. Rose was already substantially impeached; there was abundant evidence upon which to convict Trowery; and Rose's testimony, even if believed, would not exculpate Trowery.

### (5)

■ It is true the co-defendant Fred Trowery, Jr., told Detective Bowie some-time after the execution of the search warrant at the Trowery residence that everything (cocaine) seized therein was his and that his uncle John Trowery had no knowledge that it was there. On the contrary, however, there was the testimony of Goodson that John Trowery gave him cocaine out of a jar just prior to the execution of the search warrant. Also, Special Agent Richard W. Sye, Jr., the case agent who interviewed Fred Trowery, Jr., testified that during the interview Fred Trowery stated that the cocaine found at the Trowery residence was *not* his. The agent recalled replying that he knew it wasn't Fred's.

Thus, Fred Trowery flatly contradicted his admission. Neither Trowery took the witness stand, so the contradiction remained unexplained and a matter for the jury to decide. All the attendant circumstances supplied sufficient evidence for the jury to believe beyond a reasonable doubt that John Trowery—and not Fred Trowery, Jr.—was the possessor of the cocaine which was the subject of Count 4.

### (6)

■ The court instructed the jury that an occupant of a house could be in constructive possession of cocaine found in a jar in the yard adjoining the house. Trowery complains there was insufficient proof that the residence in which he was arrested was, in fact, his own. But, here was ample proof that John Trowery and his wife were in the bedroom of the house at the time of the execution of the search warrant and that John Trowery gave cocaine to Goodson from a jar in the kitchen of the house prior to the execution of the search warrant. Goodson testified that he left John Trowery's home on Lincoln Avenue before he was arrested. Detective Bowie testified that on April 26, 1977, he went to the Trowery residence. Officer Ralph McDaniel testified that he knew Trowery and that Trowery lived at 1335 Lincoln Avenue; that he had seen Trowery on the porch of the house on several occasions, and that he had also seen Trowery on the porch and in

the yard with Trowery's wife and daughter. There was ample evidence for the jury to reasonably infer that the house at which the search warrant was executed was occupied by John Trowery and his family on April 26, 1977.[2]

---

2. John Trowery signed his recognizance bond and indicated his residence was at "1335 Lincoln Avenue, Pittsburgh, Pennsylvania."